## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **MONICA PORTER,** | ) |
| 1701 E 97th Street | ) |
| Kansas City, Missouri 64131, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )      Case No.: |
| | ) |
| **MISSION CHATEAU, L.L.C.,** | )      **JURY TRIAL DEMANDED** |
|  (Serve Resident Agent: | ) |
|   Michael F. Flanagan | ) |
|   14005 Outlook | ) |
|   Overland Park, Kansas 66223), | ) |
| | ) |
|     and | ) |
| | ) |
| **TUTERA SENIOR LIVING &** | ) |
| **HEALTH CARE, L.L.C.,** | ) |
| (Serve Resident Agent: | ) |
|   Michael F. Flanagan | ) |
|   14005 Outlook | ) |
|   Overland Park, Kansas 66223), | ) |
| | ) |
|     and | ) |
| | ) |
| **TUTERA HEALTH CARE SERVICES,** | ) |
| **L.L.C.,** | ) |
| (Serve Resident Agent: | ) |
|   Michael F. Flanagan | ) |
|   14005 Outlook | ) |
|   Overland Park, Kansas 66223), | ) |
| | ) |
|     and | ) |
| | ) |
| **TUTERA GROUP, INC.,** | ) |
| (Serve Resident Agent: | ) |
|   Michael F. Flanagan | ) |
|   14005 Outlook | ) |
|   Overland Park, Kansas 66223), | ) |
| | ) |
|     Defendants. | ) |

## COMPLAINT

Plaintiff Monica Porter states the following as her causes of action against Defendants Mission Chateua, L.L.C., Tutera Senior Living & Health Care, L.L.C., Tutera Health Care Services, L.L.C., and Tutera Group, Inc.

1.     Plaintiff Monica Porter is an African American, female resident of Kansas City, Jackson County, Missouri.

2.     Defendant Mission Chateau, L.L.C. is a Kansas limited liability company that conducts business in Johnson County, Kansas.

3.     Defendant Mission Chateau, L.L.C. is an employer as defined and within the meaning of 42 U.S.C. § 2000e(b) of Title VII of the Civil Rights Act of 1964 as amended in 1991.

4.     Defendant Mission Chateau, L.L.C. is an employer as defined and within the meaning of 29 U.S.C. § 2611 of the Family and Medical Leave Act (FMLA) and the FMLA regulations.

5.     Defendant Tutera Senior Living & Health Care, L.L.C. is a Kansas limited liability company that conducts business in Johnson County, Kansas.

6.     Defendant Tutera Senior Living & Health Care, L.L.C. is an employer as defined and within the meaning of 42 U.S.C. § 2000e(b) of Title VII of the Civil Rights Act of 1964 as amended in 1991.

7.     Defendant Tutera Senior Living & Health Care, L.L.C. is an employer as defined and within the meaning of 29 U.S.C. § 2611 of the FMLA and the FMLA regulations.

8.     Defendant Tutera Health Care Services, L.L.C. is a foreign limited liability company that conducts business in Johnson County, Kansas.

2

9.     Defendant Tutera Health Care Services, L.L.C. is an employer as defined and within the meaning of 42 U.S.C. § 2000e(b) of Title VII of the Civil Rights Act of 1964 as amended in 1991.

10.     Defendant Tutera Health Care Services, L.L.C. is an employer as defined and within the meaning of 29 U.S.C. § 2611 of the FMLA and the FMLA regulations.

11.     Defendant Tutera Group, Inc. is a foreign corporation that conducts business in Johnson County, Kansas.

12.     Defendant Tutera Group, Inc. is an employer as defined and within the meaning of 42 U.S.C. § 2000e(b) of Title VII of the Civil Rights Act of 1964 as amended in 1991.

13.     Defendant Tutera Group, Inc. is an employer as defined and within the meaning of 29 U.S.C. § 2611 of the FMLA and the FMLA regulations.

14.     Plaintiff is bringing these claims pursuant to Title VII of the Civil Rights Act of 1964, as amended in 1991, 42 U.S.C. § 2000 et seq.,; 42 U.S.C. § 1981; and the Family and Medical Leave Act, 29 U.S.C. § 2601, et seq.

15.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332.

16.     Venue is proper because a substantial part of the events or omissions giving rise to the claim occurred in Johnson County, Kansas in the District of Kansas within the meaning of 28 U.S.C. § 1391(b).

17.     Plaintiff filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) alleging that Defendants engaged in the discriminatory and/or retaliatory actions that are being raised in this lawsuit, or alternatively, the allegations of Plaintiff's lawsuit would have arisen from the investigation of Plaintiff's Charge of Discrimination.

18.     Notices of Right to Sue have been issued by the EEOC, and this action is being brought within ninety (90) days from the issuance of such Notices of Right to Sue.

19.     Plaintiff has fulfilled all conditions precedent to the bringing of this claim and has duly exhausted all administrative procedures in accordance with the law prior to instituting this lawsuit.

## ALLEGATIONS COMMON TO ALL COUNTS

20.     In February 2019, Plaintiff began working as a Certified Nursing Aide (CNA) for Mission Chateau, a senior living community in Prairie Village, Kansas with apartment homes for independent living, memory care, and assisted care.

21.     Plaintiff became a registered CNA in February 1996 and had approximately twenty-four years of experience as a CNA prior to working at Mission Chateau.

22.     Mission Chateau is part of what is known as the "Tutera Family Communities."

23.     Mission Chateau is listed as one of the senior living community locations on the website www.tutera.com.

24.     Defendant Mission Chateau, L.L.C. is owned and/or operated by Defendants Tutera Senior Living & Health Care, L.L.C., Tutera Health Care Services, L.L.C., and/or Tutera Group, Inc.

25.     At the time of Plaintiff's employment, Defendants Mission Chateau, L.L.C. and Tutera Senior Living & Health Care, L.L.C., Tutera Health Care Services, L.L.C., and/or Tutera Group, Inc.'s operations were interrelated, there was common management, there was centralized control of labor relations, and/or common ownership or financial control, including, but not limited to the following:

a.      Defendants Mission Chateau, L.L.C., Tutera Senior Living & Health Care, L.L.C., Tutera Health Care Services, L.L.C., and/or Tutera Group, Inc. all shared the same registered agent and organizer, Michael F. Flanagan.

b.      Defendants Mission Chateau, L.L.C., Tutera Senior Living & Health Care, L.L.C., Tutera Health Care Services, L.L.C., and/or Tutera Group, Inc. all shared the same registered office, 14005 Outlook, Overland Park, Kansas 66223.

c.      Defendants Tutera Senior Living & Health Care, LLC, Tutera Health Care Services, L.L.C., and/or Tutera Group, Inc. share the same mailing address registered with the Kansas Secretary of State, 7611 State Line Road, Suite 301, Kansas City, Missouri 64114.

d.      According to https://missionchateaubytutera.com, "Mission Chateau is a rental-based community showcasing extraordinary hospitality and services for independent living, assisted living, and memory care. Residents also have priority access to Tutera Senior Living & Health Care's full complement of post-acute health care services, including Home Health and Rehabilitation and Extended Stay."

e.      Defendants Tutera Senior Living & Health Care, L.L.C., Tutera Health Care Services, L.L.C., and/or Tutera Group, Inc. provided workplace policies and/or forms to Mission Chateau and/or Defendant Mission Chateau, L.L.C.

f.      Defendants Tutera Senior Living & Health Care, L.L.C., Tutera Health Care Services, L.L.C., and/or Tutera Group, Inc. provided human resource services to Mission Chateau and/or Defendant Mission Chateau, L.L.C.

g.      Defendants Tutera Senior Living & Health Care, L.L.C., Tutera Health Care Services, L.L.C., and/or Tutera Group, Inc. responded to complaints of workplace discrimination made by employees working at Mission Chateau and/or Defendant Mission Chateau, L.L.C.

h.      Defendants Tutera Senior Living & Health Care, L.L.C., Tutera Health Care Services, L.L.C., and/or Tutera Group, Inc. provided training to employees working at Mission Chateau and/or Defendant Mission Chateau, L.L.C.

i.      Defendants Mission Chateau, L.L.C. and Tutera Senior Living & Health Care, L.L.C., Tutera Health Care Services, L.L.C., and/or Tutera Group, Inc. shared common management.

j.      Defendants Mission Chateau, L.L.C. and Tutera Senior Living & Health Care, L.L.C., Tutera Health Care Services, L.L.C., and/or Tutera Group, Inc. provided benefits to employees working at Mission Chateau and/or Defendant Mission Chateau, L.L.C.

k.      Defendants Mission Chateau, L.L.C. and Tutera Senior Living & Health Care, L.L.C., Tutera Health Care Services, L.L.C., and/or Tutera Group, Inc. transferred residents from one facility to another.

26.      When Plaintiff began working at Mission Chateau, the Director of Nursing was Pamela Eickhoff (Eickhoff), a Caucasian female, and the Assistant Director of Nursing was Annie Debo (Debo), a Caucasian female.

27.      In or around late October 2019, Eickhoff resigned, and Tanya Leaming (Leaming), a Caucasian female, became the Director of Nursing.

6

28.     In or around the middle of December 2019, Debo resigned from her Assistant Director of Nursing position, and Allison Hislop (Hislop), a Caucasian female, took over as the Assistant Director of Nursing.

29.     Since Leaming took over as the Director of Nursing, Plaintiff believes that she has been subjected to different terms and conditions of employment and disparate treatment based on her race/color and subjected to a hostile and offensive work environment based on her race/color, which Plaintiff found and a reasonable person would find to be offensive.

30.     Under Leaming's leadership, Caucasian employees like Lauren Drake, Kayla Williamson (Williamson), Holly Dill, Khiley Shirey, Brianha Andrews, Makenze Nimmo, and Rebecca Londo were allowed to stand around the nursing station talking and/or allowed to work at the nursing station, but black and/or African American employees were told that they cannot do the same and were instructed to leave the nursing station area.

31.     Further, Leaming informed Plaintiff that corporate had taken away the ability for employees to work 12 hour shifts, but after making this announcement, Leaming continued to allow Williamson to work 12 hour shifts.

32.     It is Plaintiff's understanding that Williamson was also allowed to work every other Saturday, rather than working every other Saturday and Sunday, as other CNA's were required to work.

33.     Plaintiff's daughter Markeeze Davis (Davis), an African American CNA, requested to have one day of the weekend off to attend classes for cosmetology school, but Leaming denied her request and told Davis she needed to work both Saturday and Sunday every other weekend.

34.     Additionally, Leaming allowed Caucasian employees like Keith Jones to be designated as p.r.n. (as needed), but these Caucasian employees were given full-time work hours and were not required to work weekends.

35.     Additionally, if additional p.r.n. shifts were available, Defendants gave preference to Caucasian employees for those shifts.

36.     It is Plaintiff's understanding that in or around the Christmas 2019 and New Year's 2020 timeframe, Leaming offered additional compensation to some of the Caucasian employees to work the entire weekend. Plaintiff is not aware of any minority employees who were offered this opportunity.

37.     During this weekend, it is Plaintiff's understanding that several employees (Kayla Williamson, Lauren Drake, and London Caldwell, all of whom are Caucasian) had been drinking on the job, but to Plaintiff's knowledge, no disciplinary action was taken against any of these employees, despite managements' knowledge.

38.     Black and/or African American employees were often required to work rotating positions on days where the facility was short staffed in assisted living, but when the facility was short staffed in the memory care unit, they were not always subjected to the same treatment.

39.     Additionally, it is also Plaintiff's understanding that Lauren Drake made stereotypical comments at work in October 2019 about how black people act, but no disciplinary action was taken against her.

40.     Further, leadership and promotion opportunities at Mission Chateau were given to Caucasian employees, regardless of seniority or experience.

8

41.     While applications for these opportunities were accepted from employees of color, employees of color were not given the positions.

42.     For example, in or around January 2020, Plaintiff learned that Williamson had been promoted to the Mentor/Lead CNA position, instead of her or another qualified black and/or African Americans employee like Stephanie Wilbur (Wilbur), Anne Sagoe, and Randa Echeverria.

43.     On or about January 23, 2020, Plaintiff and Wilbur told Miles Nease (Nease), the Executive Director for Assisted Living and Memory Care at Mission Chateau, that they wanted to file grievances.

44.     Nease told Plaintiff and Wilbur that they would need to talk to Leaming.

45.     Later that same day, Plaintiff and Wilbur met with Leaming for approximately an hour.

46.     During this meeting, Plaintiff and Wilbur told Leaming that they felt the black employees were treated differently and that the performance of black employees was criticized more than the performance of the Caucasian employees.

47.     At the conclusion of the meeting, Leaming wanted Plaintiff and Wilbur to sign a document stating that they were hurt and disappointed.

48.     Plaintiff and Wilbur both expressed concerns about signing this document because it did not reflect what they had discussed with Leaming.

49.     Leaming assured them that she would include the additional information they had shared with her so Plaintiff and Wilbur went ahead and signed the document she presented to them.

50.     Leaming also told Plaintiff and Wilbur that they would receive a letter, but Plaintiff never received a letter and no one contacted her about the grievance she filed until June 3, 2020.

9

51.    It is Plaintiff's understanding that other African American and/or black employees, other than Wilbur and herself, have also complained of race discrimination and had their complaints ignored.

52.    After Plaintiff reported her good faith belief that she was being discriminated against and subjected to disparate treatment and/or harassment based on her race/color, Defendants retaliated against Plaintiff.

53.    Approximately two weeks after Plaintiff reported how black employees were treated differently at work than Caucasian employees and filed a grievance, Leaming issued Plaintiff her first "Employee Corrective Action Form" for two call ins that had occurred in late January wherein Plaintiff was unable to work because she needed to take her mother to her medical appointments. Plaintiff's mother had a stroke in December 2019. After her stroke, Plaintiff requested intermittent Family and Medical Leave Act leave, but no one ever responded to her request.

54.    On or about June 3, 2020, Marilyn Dove (Dove), the Human Resources Director for Defendants, questioned Plaintiff as to whether she was present when Wilbur had spoken to Nease and Leaming about filing a grievance.

55.    Plaintiff told her "yes" and told her she had also filed a grievance that same day, but that she never heard back from anyone.

56.    Dove then asked Plaintiff to go and get Wilbur so she could ask her some questions.

57.    After Plaintiff reported how black employees were treated differently at work than Caucasian employees and filed a grievance, Leaming and Nease began scrutinizing Plaintiff's

work performance and harassing her, especially when she was working with Wilbur and Sherita Pearson (Pearson), two other black and/or African American employees.

58.     On or about June 23, 2020, it is Plaintiff's understanding that Jacob Ntembe (Ntembe), a CNA who is African, was called into Leaming's office and questioned about how the "girls," i.e. Plaintiff, Wilbur, and Pearson, and (all African American women), were doing work wise.

59.     Ntembe told Plaintiff and Wilbur that he was also asked if he thought two new Caucasian women that had been hired would be a good fit in the memory care unit, the unit where Plaintiff, Porter, and Pearson worked.

60.     On or about June 24, 2020, Leaming and Nease came to check all of their rooms. Plaintiff does not believe they checked rooms for any of the employees working in the assisted living unit.

61.     In comparison, Keith Jones and Kat Simpson, both Caucasian employees, were caught talking on their personal cellular telephones during work hours, but they were not disciplined.

62.     Plaintiff believes it was this same day that Leaming told Wilbur and Plaintiff that they could no longer take breaks, including lunch breaks, together.

63.     Plaintiff is not aware of any other employees who were given these same restrictions.

64.     Because of COVID-19, new residents were supposed to be isolated in their rooms for 14 days and employees who entered the rooms of these residents were to wear personal protective equipment (PPE).

11

65.     However, the "isolated" residents left their rooms and interacted with the other residents during their "isolation" period.

66.     On or about June 26, 2020, Leaming issued Plaintiff a second "Employee Corrective Action Form" for being in a resident's room who was on "isolation" without personal protective equipment (PPE).

67.     Plaintiff had not worn protective equipment in the resident's room since the resident had been out of isolation and had interacted with the other residents.

68.      Keith Jones (Jones), a Caucasian employee, who was in the resident's room with Plaintiff also did not wear any PPE.

69.     In addition to Jones, Plaintiff is aware of other employees who did not wear PPE into the rooms of residents who were on "isolation" and were not disciplined, including Leaming.

70.     Plaintiff believes Leaming singled her out because of her race/color and/or as an act of retaliation.

71.     On or about June 30, 2020, Plaintiff and Wilbur were the only employees working in the memory care unit.

72.     Normally, three employees are scheduled to work, but Leaming reassigned the third employee to work in the assisted living area.

73.     It is very difficult to work in the memory care unit with only two employees because of the type of care that is needed for the memory care residents.

74.     Additionally, Leaming had instructed memory care unit employees that a staff person should be in the dining room when residents were eating.

75.     At the time in question, no residents were in the dining room. Rather, the residents were in the living room watching T.V. or at the table doing activities.

76.     Plaintiff was sitting in a chair next to a resident because she kept trying to get up, and she was a fall risk.

77.     Ntembe came over and asked whether a different resident could get her breakfast.

78.     Plaintiff told Ntembe that she would tell the kitchen staff.

79.     Plaintiff put the resident with whom she had been sitting on the couch and went into the dining room to arrange to get breakfast for the other resident.

80.     The resident's breakfast was brought to her, and Plaintiff sat at the table with this resident as she ate her breakfast. Wilbur was also sitting at the table.

81.     A few minutes later, Nease and Leaming came into the area.

82.     Plaintiff heard Nease say, "Look at them sitting down."

83.     In response, Leaming said, "This is the shit I'm talking about."

84.     Plaintiff and Wilbur just looked at each other.

85.     Plaintiff was shocked at what she had heard.

86.     Nease and Leaming left, and Hislop then came in and told Plaintiff and Wilbur that Leaming had seen two aides sitting at the table.

87.     Hislop said she knew that because she had seen Plaintiff with a different resident not long ago.

88.     Leaming then came into the area, and Hislop told Plaintiff that she would stay in the dining room.

89.     Leaming told Plaintiff that she needed to go back in the living room to sit with one of the residents.

90.     Soon after, the kitchen staff then told them that the room trays were ready to be delivered.

91.     Plaintiff told Leaming that someone else was going to need to take the room trays to the residents because Plaintiff and Wilbur had been assigned to do one-on-one resident care.

92.     Leaming said she would take the room trays.

93.     At that time, Plaintiff put the resident she had been told to go back and sit with in her wheel chair and sat her at the activity table.

94.     Leaming had taken one of the room trays while Plaintiff was putting the resident in her wheel chair.

95.     Leaming came out of the room of a resident who was in isolation.

96.     Leaming was not wearing any PPE.

97.     Plaintiff believes Leaming noticed that Plaintiff saw her.

98.     Leaming then announced she was going to get the next room tray, and she would put her gown on before taking it into the resident's room.

99.      Approximately five minutes later, Leaming announced that all isolation rooms were no longer isolated anymore.

100.     On July 1, 2020, Dove met with Plaintiff and asked her a series of questions related to whether or not Hislop had said certain things to them about Leaming.

101. All the questions Dove asked Plaintiff were "yes" or "no" questions, and the questions related to whether Hislop told Plaintiff that Leaming had called the black female employees "nigger bitches."

102. Since Hislop had not, Plaintiff answered "no" to her questions.

103. Plaintiff then told Dove how black/African American employees like herself were being treated every day, i.e. getting harassed by Leaming, Nease, and other staff members.

104. Plaintiff shared with her how Leaming and Nease came over to their unit to watch them and look in the rooms of their residents, how they (black/African American employees) were told that they weren't allowed to stand at the nursing station, allowed to take breaks together, etc., all things the Caucasian employees were allowed to do without anything being said to them.

105. Plaintiff told Dove that Leaming called other staff members in her office to ask them if they (black/African American employees) were doing their job and/or whether or not they (black/African American employees) had said anything about her.

106. Plaintiff told Dove how John, the Caucasian bus driver who is married to Valerie the Marketing Director, tells black/African American employees what to do and how Plaintiff feels he treats black/African Americans in a disrespectful manner.

107. Plaintiff told her that Nease was aware of the harassment but took no action.

108. Plaintiff also told Dove that they (black/African American employees) see and feel that they were not wanted.

109. Plaintiff mentioned the grievance she had filed, and Dove said she hadn't seen a grievance from her, rather Dove told Plaintiff she was a witness to Wilbur's meetings with Nease and Leaming.

15

110.    Dove's statement was incorrect, as Plaintiff and Wilbur both filed grievances and reported different treatment based on race/color.

111.    Furthermore, Plaintiff told Dove that she filed for Family and Medical Leave Act leave in January 2020 because her mother had a stroke, and she needed to take her mother to her appointments.

112.    Plaintiff told Dove no one ever responded to her request for FMLA leave.

113.    While she was telling Dove how she and other black/African American employees were being harassed, Plaintiff became very emotional and had to stop a couple of times to collect herself.

114.    Dove asked Plaintiff if Jones was working.

115.    Plaintiff told Dove he wouldn't be back until Friday.

116.    Dove then asked Plaintiff if Anna Harts (Harts) was working.

117.    Plaintiff told her "yes," and Dove asked Plaintiff to send Harts in to talk to her.

118.    On or about July 9, 2020, Plaintiff went on her unit and got residents up for breakfast.

119.    Around 8:50 a.m., Tana Richie from Human Resources came and got Plaintiff off her unit and took her to Nease's office.

120.    When Plaintiff arrived, Nease, Dove, and another human resources person (Caucasian male) were present.

121.    Dove proceeded to tell Plaintiff that the investigation was over and that they were firing her because she had allegedly made a false statement during an investigation.

122.    Plaintiff told Dove that she had told the truth.

16

123. The "Employee Corrective Action" form Plaintiff received said she was fired for "[m]aking a false, misleading, or incomplete statement in a community investigation."

124. It further stated, "On 7/1/20, when asked by the company's Regional HR Director during an EEOC investigation, Monica denied that Allison Hislop had informed her and other Mission Chateau employees that the Health Care Coordinator had [falsely] called them inappropriate names and racial slurs. During the investigation, it was substantiated, by two witnesses, that Allison did in fact inform Monica and other Mission Chateau employees that the Health Care Coordinator had [falsely] called them inappropriate names and racial slurs."

125. It is Plaintiff's understanding that Porter and Hislop were also both fired the day before she was terminated.

126. It is further Plaintiff's understanding that prior to Hisplop's termination, Hislop had reported that Leaming had made racist comments in the workplace and/or engaged in retaliatory behavior.

127. Since Leaming became the Director of Nursing, the following black/African American employees have been fired or quit: Stephanie Wilbur, Ronald Baker, Randa Echeverria, Makenze Nimmo, Latisha McCuiston, Nancy Gaeten, Karen Jorden, Connie Cain, Sherrie Moore, Josette Palacios, Damond Russell, Chardonney Atkins, Joshua Galiwango, Angela Bell, and Ann Sagoe.

## COUNT I – RETALIATION IN VIOLATION OF TITLE VII AND 42 U.S.C. §1981

128. Plaintiff hereby incorporates by reference into Count I all allegations contained in all preceding paragraphs herein.

17

129. As set forth above, Plaintiff engaged in protected activity, including without limitation, reporting to Defendants her good faith belief and/or reasonable belief that she and others were being discriminated against based on her/their race/color.

130. As a result of and in retaliation for engaging in one or more protected activities described herein, Defendants retaliated against Plaintiff, including, but not limited to, issuing Plaintiff Employee Corrective Actions, scrutinizing her work performance, placing limitations on her breaks, and terminating her employment in violation of Title VII of the Civil Rights Act of 1964, as amended in 1991, 42 U.S.C. § 2000 et seq., and 42 U.S.C. § 1981.

131. All actions or inactions of or by Defendants occurred by and through their agents, servants, or employees acting within the course and scope of their employment, as set forth herein.

132. As a direct and proximate result of the unlawful conduct of Defendants as set forth herein, Plaintiff has suffered damages including emotional distress, pain and suffering, past and future lost wages and benefits, a detrimental job record, career damage and diminished career potential, mental distress in the form of embarrassment, degradation, humiliation, anxiety, loss of enjoyment of life, loss of sleep, and other nonpecuniary losses. Plaintiff is also entitled to other appropriate equitable relief.

133. The conduct of Defendants was intentional, malicious, and/or outrageous and evidenced an evil motive or conscious disregard for the rights of Plaintiff and others similarly situated, entitling Plaintiff to an award of punitive damages.

134. Plaintiff is entitled to recover all her costs, expenses, expert witness fees, and attorneys' fees incurred in this matter as well as other appropriate equitable relief.

18

**WHEREFORE,** Plaintiff prays for judgment against Defendants for actual, compensatory, and punitive damages, all costs, expenses, expert witness fees and attorneys' fees incurred herein, appropriate equitable relief, for interest at the highest lawful rate, and for such other and further relief as the Court deems just and proper.

<u>COUNT II - RACE DISCRIMINATION IN VIOLATION OF<br>TITLE VII AND 42 U.S.C. §1981</u>

135.    Plaintiff hereby incorporates by reference into Count II all allegations contained in all preceding paragraphs herein.

136.    During Plaintiff's employment with Defendants and as set forth above, Defendants subjected Plaintiff to discrimination and disparate treatment based on her race and/or color with respect to her compensation, terms, conditions, and/or privileges of employment in violation of Title VII of the Civil Rights Act of 1964, as amended in 1991, 42 U.S.C. § 2000 et seq., and 42 U.S.C. § 1981.

137.    Plaintiff has a contract for employment as construed pursuant to 42 U.S.C. § 1981 which Defendants violated because of Plaintiff's color and/or race, African American.

138.    During Plaintiff's employment with Defendants, Defendants denied Plaintiff the same right to make and enforce contracts and to the full and equal benefits of all laws and proceedings for the security of persons and property as is enjoyed by white citizens in violation of 42 U.S.C. § 1981.

139.    All actions or inactions of or by Defendants occurred by and through their agents, servants, or employees acting within the course and scope of their employment, as set forth herein.

140.    As a direct and proximate result of the unlawful conduct of Defendants as set forth

herein, Plaintiff has suffered damages including emotional distress, pain and suffering, past and future lost wages and benefits, a detrimental job record, career damage and diminished career potential, mental distress in the form of embarrassment, degradation, humiliation, anxiety, loss of enjoyment of life, loss of sleep, and other nonpecuniary losses. Plaintiff is also entitled to other appropriate equitable relief.

141.    The conduct of Defendants was intentional, malicious, and/or outrageous and evidenced an evil motive or conscious disregard for the rights of Plaintiff and others similarly situated, entitling Plaintiff to an award of punitive damages.

142.    Plaintiff is entitled to recover all her costs, expenses, expert witness fees, and attorneys' fees incurred in this matter as well as other appropriate equitable relief.

**WHEREFORE,** Plaintiff prays for judgment against Defendants for actual, compensatory, and punitive damages, all costs, expenses, expert witness fees and attorneys' fees incurred herein, appropriate equitable relief, for interest at the highest lawful rate, and for such other and further relief as the Court deems just and proper.

## COUNT III – RACIALLY HOSTILE AND OFFENSIVE WORK ENVIRONMENT IN VIOLATION OF TITLE VII

143.    Plaintiff hereby incorporates by reference into Count III all allegations contained in all preceding paragraphs herein.

144.    As set forth above, Plaintiff was subjected to a hostile and offensive work environment because of her race and/or color which she found and which a reasonable person would find to be offensive and which altered the terms and conditions of her employment in violation of Title VII of the Civil Rights Act of 1964, as amended in 1991, 42 U.S.C. § 2000 et seq.

145.    The conduct at issue was engaged in by Plaintiff's supervisors, for which Defendants should be held vicariously liable.  Alternatively, to the extent that the conduct at issue was engaged in by non-supervisory employees of Defendants, Defendants knew or should have known about the hostile and abusive work environment, but Defendants failed to take prompt or appropriate remedial or corrective action in response to the hostile and abusive work environment.

146.    All actions or inactions of or by Defendants occurred by or through their agents, servants, or employees acting within the course and scope of their employment, as set forth herein.

147.    As a direct and proximate result of the unlawful conduct of Defendants as set forth herein, Plaintiff has suffered damages including emotional distress, pain and suffering, past and future lost wages and benefits, a detrimental job record, career damage and diminished career potential, mental distress in the form of embarrassment, degradation, humiliation, anxiety, loss of enjoyment of life, loss of sleep, and other nonpecuniary losses. Plaintiff is also entitled to other appropriate equitable relief.

148.    The conduct of Defendants was intentional, malicious, and/or outrageous and evidenced an evil motive or conscious disregard for the rights of Plaintiff and others similarly situated, entitling Plaintiff to an award of punitive damages.

149.    Plaintiff is entitled to recover all her costs, expenses, expert witness fees, and attorneys' fees incurred in this matter as well as other appropriate equitable relief.

**WHEREFORE,** Plaintiff prays for judgment against Defendants for actual, compensatory, and punitive damages, all costs, expenses, expert witness fees and attorneys' fees incurred herein, appropriate equitable relief, for interest at the highest lawful rate, and for such other and further relief as the Court deems just and proper.

## COUNT IV - VIOLATIONS OF THE FAMILY AND MEDICAL LEAVE ACT

150.   Plaintiff hereby incorporates by reference into Count IV all allegations contained in all preceding paragraphs herein.

151.   Defendants are engaged in commerce or in an industry or activity affecting commerce and employ fifty (50) or more employees for each working day during twenty (20) or more calendar workweeks within fifty (50) miles of the work site where Plaintiff was employed, within the meaning of the FMLA and its accompanying regulations.

152.   Plaintiff was employed with Defendants for over twelve (12) months and worked at least 1,250 hours of service for the twelve (12) month period preceding Plaintiff's need for leave under the FMLA.

153.   Plaintiff informed Defendants that her Mother had a serious health condition, i.e. a stroke, and that she needed to take time off work.

154.   Defendants failed to inform and/or offer Plaintiff leave under the FMLA.

155.   Plaintiff learned through a co-worker of her right to take medical leave under the FMLA to care for her mother.

156.   Plaintiff then requested, completed, and submitted her FMLA leave documents to Defendants' human resources and/or management employees in or around January 2020.

157.   Defendants failed to respond and/or provide Plaintiff leave under the FMLA.

158.   Defendants disciplined Plaintiff for absences that should have been protected leave under the FMLA.

159.   The conduct of Defendants, as alleged above, constituted interference and/or retaliation with Plaintiff's rights under the FMLA.

22

160.    As a direct and proximate result of the unlawful conduct of Defendants as set forth herein, Plaintiff has suffered damages which include the loss of past and future wages and benefits, a detrimental job record, career damage, and attorneys' fees, expert witness fees and costs, and other non-pecuniary losses.

161.    Defendants' conduct was willful, entitling Plaintiff to an award of liquidated damages and to appropriate equitable relief, including without limitation, reinstatement.

**WHEREFORE,** Plaintiff prays for judgment against Defendants for actual and liquidated damages, all costs, expenses, expert witness fees and attorneys' fees incurred herein, appropriate equitable relief, for interest at the highest lawful rate, and for such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests a jury trial on all Counts and all allegations contained herein.

## REQUEST FOR PLACE OF TRIAL

Plaintiff hereby requests that the trial of this matter take place in Kansas City, Kansas.

Respectfully submitted,

**EMPLOYEE & LABOR LAW GROUP**
**OF KANSAS CITY, LLC**

By:    /s/Kristi L. Kingston
          Kristi L. Kingston, KS Bar No. 19126
          12920 Metcalf Avenue, Suite 180
          P.O. Box 25843
          Overland Park, KS  66225
          Ph:    (913) 286-5200
          Fax:    (913) 286-5201
          Email: kristi@elgkc.com

**ATTORNEY FOR PLAINTIFF**

23